COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges O'Brien, Causey and Frucci
Argued at Virginia Beach, Virginia

OMARI ANDRE GREEN

MEMORANDUM OPINION[*] BY
v.        Record No. 2012-24-1        JUDGE STEVEN C. FRUCCI
DECEMBER 16, 2025

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
James C. Lewis, Judge

Josue M. Casanova for appellant.

Tanner M. Russo, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

Following a jury trial, Omari Andre Green was convicted of maliciously shooting at a

vehicle resulting in death and participating in a criminal act for the benefit or at the direction of a

gang. On appeal, Green contends that the circuit court erred in: (1) failing to set aside the jury's

verdict because the evidence was insufficient to prove two predicate criminal acts, and therefore,

it failed to show the existence of a criminal street gang; (2) admitting evidence from a recovered

cell phone "because chain of custody rules apply to cell phones and the chain of custody . . . had

been broken"; (3) admitting pictures from "social media because they violated the best evidence

rule, lacked an adequate foundation, and were not properly authenticated"; and (4) admitting

footage captured by motion-activated cameras affixed to homes that showed the shooting and

individuals "smacking" prior to the shooting because the clips of footage "lacked an adequate

---

[*] This opinion is not designated for publication. See Code § 17.1-413(A).

foundation, were irrelevant, were not properly authenticated, and were unfairly prejudicial."[1] For the following reasons, this Court affirms the circuit court's judgment.

BACKGROUND[2]

On June 14, 2021, Taeshon Johnson ("Johnson") was "chilling" with Malachi Handy and Nasir Thomas in Norfolk, Virginia. The group met up with Green, Zion Urquhart, and Hassan Johnson ("Hassan") at "Jontreal's" house "around noontime."[3] Johnson, Green, Urquhart, Thomas, and Handy "decided to [go to Virginia Beach to] go smacking," an activity where they "ride around, walk[] around just pulling on car door handles and just try[] to see if [they could] get inside the car" to steal items. The group traveled in two vehicles, with Green driving Urquhart and an unknown individual in a blue Honda and Handy driving Johnson, Hassan, and Thomas in a grey Honda. All three individuals in the blue Honda, along with Hassan and Handy in the grey Honda, were armed.

The group proceeded to go smacking in Gem Court in Virginia Beach. Motion-activated cameras affixed to three homes in the area captured the smacking.[4] The footage showed Hassan and

---

[1] Prior to oral argument, Green withdrew his remaining assignments of error.

[2] "[W]e recite the evidence below 'in the "light most favorable" to the Commonwealth, the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This standard "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

[3] Johnson, who testified at trial, did not know Jontreal's full name.

[4] Over Green's objection, this footage was entered into evidence at trial. At trial, the homeowners who installed and maintained the motion-activated devices testified to the source, production, and accuracy of the clips. This included testimony about how they were the ones who had installed or maintained the cameras on their homes, the process for how their cameras record, the accuracy of the timestamps, and the way the cameras notified them when they start to record. The homeowners testified that in their experience, the cameras recorded accurately (including testimony from three of the homeowners that there were occasions when they received a notification that the cameras were recording, looked outside their homes, and they saw

Johnson trying to open the doors of vehicles in different driveways at 11:11 p.m. and 11:14 p.m. while Handy drove by and was followed by the vehicle Green was driving.[5] A car alarm went off at 11:15 p.m., causing both vehicles to speed away.

After the alarm sounded, the group stopped smacking. They drove for "a minute or so" when Green's vehicle "flagged [the other vehicle] down." Green exited the blue Honda and told them that "[t]he ops out here," meaning the people they "have a problem with" were there. Green returned to the vehicle, and the two vehicles continued driving. Green pulled the blue Honda into Mooregate Court and parked in the middle of the court. Green and the others exited the vehicle. Green and one of the others began firing at a nearby gold vehicle. Meanwhile, the grey Honda made a U-turn on Weblin Drive. Thomas and Hassan rolled down their windows. "Hanging" over the front passenger window of the grey Honda, Thomas began shooting in the direction of a gold vehicle while Hassan fired out of the backseat window.

Inside the gold vehicle were Dasharn Wright, Tajan Reese, Isajiah Brown, and D.R.K.[6] Wright saw the grey Honda make the sharp U-turn and heard the gunshots. Reese heard "forty plus" gunshots. Wright "went up the curb" and "started driving behind the other cars." He then "hopped out" of the vehicle and ran to a friend's house. Reese and Brown ran out of the vehicle to Reese's house. Green and his passengers returned to the blue Honda, and both Hondas traveled back to Jontreal's house in Norfolk.

Shortly after, Officer Shoenbach responded to the scene. He found the gold vehicle running with three doors open. D.R.K. was "slumped" in the back seat. He had passed away due to a

---

the same activity as what was being recorded). The homeowners also testified that the footage was not altered or able to be edited.

[5] At trial, the individuals and vehicle were identified by Johnson. While Green was identified as driving the blue Honda, he could not be seen in the smacking footage.

[6] We use initials rather than names to protect the privacy of the victim.

gunshot wound to the head. A nearby home surveillance camera captured the shooting.[7] The footage showed the blue Honda pulling into the parking lot in front of the home at 11:17 pm. A man with a white shirt (later identified as Green), a man with a red shirt, and a man in a dark-colored shirt exited the vehicle. The man in the red shirt ran out of view of the camera; Green and the man in the dark-colored shirt walked in the same direction but stayed in view of the camera. Green and the man in the red shirt then fired gunshots at a target off camera before all three men ran back to the vehicle and drove away.

I. Geolocation Analysis

A few days after the shooting, Johnson and Handy traveled to Fairfax in the grey Honda and were in a car crash. A Virginia State Trooper investigated the car crash and found a cell phone. As the grey Honda had been stolen, the cell phone was initially sent to Mateo Miller, the owner of the vehicle. Miller stated that the phone was not on when he opened the package, and when he did turn it on, the phone was locked by a passcode he did not know. Miller turned off the phone and returned it to the police. Miller said that he did not tamper with the contents of the phone and stated that the package with the cell phone did not appear to have been tampered with or opened when he received it. Johnson later identified the phone as his cell phone.

Later, Handy's phone and Johnson's phone were both used in a geolocation analysis conducted by Detective Jachimiak. He opined, in part, that both phones had traveled together the night of the shooting, including traveling down Gem Court, leaving Gem Court around 11:15 p.m., being in the vicinity of Weblin Drive and Mooregate Court at 11:18 p.m., and traveling back towards Norfolk at 11:29 p.m.

---

[7] Over Green's objection, thirty seconds of this footage was admitted at trial. Similarly to the other footage, at trial, the homeowner testified to the accuracy and maintaining of the camera.

II. Criminal Street Gang

At trial, Johnson testified that Green, Hassan, and Urquhart were members of the "Spazz" gang. He described how prior to June 14, 2021, he went smacking with the same group and other Spazz gang members. He also described how Spazz gang members had taken items from vehicles when smacking.

Detective Hansen, a witness who had qualified as an expert in gang culture, had monitored the Spazz gang, debriefed known or suspected members, and "certified" between fifteen and twenty members. At trial, he described how the Spazz gang was associated with "[a] lot of incidents involving stolen vehicles, firearm-related offenses [and] shooting[s] at occupied dwelling[s]."

Detective Phillips, who qualified as an expert in gang culture and investigation, testified that the gang "use[s] stolen cars to commit shootings and/or larceny of vehicles, which they call 'smacking.'" He also stated that Hassan and Urquhart were certified Spazz gang members. Detective Phillips also documented and took screenshots of Green's social media posts, including those from a "hatsgone_mad" Instagram account, that showed Green displaying Spazz gang hand signs and associating with Spazz gang members. These screenshots were admitted into evidence.[8]

A 2021 conviction order reflecting that Keitric Church was a Spazz gang member that had been convicted and sentenced for robbery and use of a firearm in commission thereof (the "Church

---

[8] Green objected to these screenshots, claiming they violated the best evidence rule. After making his argument, he clarified to the circuit court that his objection was to "best evidence" and that he had "no objection besides" the best evidence objection.

order") was admitted into evidence. The Church order reflected that the committed crimes were done in association with the Spazz gang.[9]

Ultimately, Green was convicted of maliciously shooting at a vehicle resulting in death and participating in a criminal act for the benefit or at the direction of a gang. Green appeals.

ANALYSIS

I. The Existence of a Criminal Street Gang

Code § 18.2-46.2 forbids a person from "actively participat[ing] in or [being] a member of a criminal street gang and . . . knowingly and willfully participat[ing] in any predicate criminal act committed for the benefit of, at the direction of, or in association with any criminal street gang." Under Code § 18.2-46.1, "[c]riminal street gang" is defined as:

> any ongoing organization, association, or group of three or more persons, whether formal or informal, (i) which has as one of its primary objectives or activities the commission of one or more criminal activities; (ii) which has an identifiable name or identifying sign or symbol; and (iii) whose members individually or collectively have engaged in the commission of, attempt to commit, conspiracy to commit, or solicitation of two or more predicate criminal acts, at least one of which is an act of violence, provided such acts were not part of a common act or transaction.[10]

The statute further lists what constitutes a "[p]redicate criminal act," including any act of violence, any "violation of § . . . 18.2-147,"[11] and "any substantially similar offense under the

_____

[9] A juvenile and domestic relations district court conviction order for carrying a loaded firearm in public, possession of a firearm, and receiving stolen goods involving Thomas was also admitted into evidence. Unlike the Church order, this order did not specifically state whether Thomas was involved with the Spazz gang at the time.

[10] Code § 18.2-46.1 has been amended since the date of offense in the case at hand; however, the cited language above was in effect at the time of this case.

[11] Code § 18.2-147, in part, makes it unlawful to enter into the vehicle of another, without their consent, with the intent to commit any crime.

laws of another state or territory of the United States, the District of Columbia, or the United

States." Code § 18.2-46.1.

In the case at hand, it is undisputed that the Church order was sufficient to prove one

predicate criminal act.[12] However, Green contends that the evidence was insufficient to prove a

second predicate criminal act, and therefore, he argues the Commonwealth failed to prove the

existence of a criminal street gang.[13]

"Because the language of th[e] code sections is free from ambiguity, the plain meaning

controls." *Phillips v. Commonwealth*, 56 Va. App. 526, 536 (2010). "In its definition of a

criminal street gang, the General Assembly mandated that, *inter alia*, the organization at issue

'have engaged' in at least two 'predicate acts.'" *Id.* (quoting Code § 18.2-46.1 and defining

"predicate" as an "event [that] occurs before a subsequent event"). Therefore, "the plain

meaning of the statute necessarily requires that the criminal acts establishing the existence of the

criminal street gang occur *before*, not *contemporaneously* with, the offense for which the

existence of the criminal street gang is required." *Id.* at 537.

Here, the record provides ample evidence from which a rational trier of fact could have

found that members of a group known as the Spazz engaged in two or more predicate criminal

acts prior to June 14, 2021. For example, Taeshon Johnson testified that prior to June 14, 2021,

he and Spazz members engaged in smacking while armed. He described smacking as "go[ing] in

---

[12] As it was a robbery conviction, it therefore also satisfies the requirement of a predicate act involving an act of violence.

[13] "When interpreting and applying a statute, [courts] assume that the General Assembly chose, with care, the words it used in enacting the statute." *City of Richmond v. Va. Elec. & Power Co.*, 292 Va. 70, 75 (2016) (alteration in original) (quoting *Kiser v. A.W. Chesterton Co.*, 285 Va. 12, 19 n.2 (2013)). As such, we note that the General Assembly chose to use the words "act" and "violation" rather than "conviction" when providing the definitions in Code § 18.2-46.1. Also, at oral argument, Green conceded that the plain language of Code § 18.2-46.1 would not require a "conviction" in order to find a "predicate criminal act."

cars" and taking "money, clothes, shoes, guns," or other items. He further stated that the group has "actually taken" items from the "cars before." This act would be a violation of Code § 18.2-147 that occurred prior to the night of the shooting, and therefore, looking at the evidence in the light most favorable to the Commonwealth, a rational trier of fact could conclude that Spazz gang members participated in smacking prior to June 14, 2021, and that such an act was a "predicate criminal act." As the evidence was sufficient for a reasonable trier of fact to find two or more predicate criminal acts, it was sufficient to find that a criminal street gang existed.

II. Admission of Evidence

"When reviewing a [circuit] court's decision to admit or exclude evidence, we apply an abuse of discretion standard." *Bista v. Commonwealth*, 303 Va. 354, 370 (2024). "In this context, 'we do not substitute our judgment for that of the [circuit] court. Rather, we consider only whether the record fairly supports the [circuit] court's action." *Id.* (quoting *Kenner v. Commonwealth*, 299 Va. 414, 423 (2021)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Commonwealth v. Barney*, 302 Va. 84, 94 (2023) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

a. The Recovered Cell Phone

Green contends that the admission of evidence collected from Johnson's recovered cell phone was an error "because chain of custody rules apply to cell phones and the chain of custody had been broken."[14] However, this Court need not determine whether the circuit court erred by admitting the evidence because, even assuming it did, any error is harmless.

"[A]n erroneous evidentiary ruling does not require reversal of a criminal conviction where the error is harmless." *Dean v. Commonwealth*, 30 Va. App. 49, 54 (1999) (alteration in

---

[14] "The determination on a chain of custody challenge lies [also] within the [circuit] court's broad discretion and will not be overturned on appeal absent an abuse of that discretion." *Pope v. Commonwealth*, 60 Va. App. 486, 511 (2012).

original) (quoting *Brown v. Commonwealth*, 25 Va. App. 171, 182 (1997) (en banc)). "A non-constitutional error is harmless '[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'" *Graves v. Commonwealth*, 65 Va. App. 702, 712 (2016) (alteration in original) (quoting *Turman v. Commonwealth*, 276 Va. 558, 567 (2008)). "This Court may uphold a decision on the ground that any error involved is harmless only if it can conclude, without usurping the jury's fact-finding function, 'that the error did not influence the jury[] or had but slight effect.'" *Id.* (alteration in original) (quoting *Clay v. Commonwealth*, 262 Va. 253, 260 (2001)).

Here, the evidence at issue is cell phone location data from Johnson's cell phone that was used in the geolocation analysis conducted by Detective Jachimiak. Importantly, the geolocation analysis Detective Jachimiak presented was not solely based on the data from Johnson's cell phone but also on data from Handy's cell phone. Handy's cell phone location data and Johnson's cell phone location data showed that the two cell phones had traveled together throughout Virginia Beach at the time surrounding the shooting (and therefore, showed evidence of the same locations). Green does not challenge the admission of evidence from Handy's cell phone nor the geolocation analysis Detective Jachimiak derived from that phone. Furthermore, there was additional, unchallenged testimony identifying Green as one of the shooters and describing the events surrounding the shooting. With numerous pieces of evidence showing the location of the witnesses, Green, and the co-defendants at the time surrounding the shooting, any effect from the admission of the evidence retrieved from Johnson's cell phone would be at most slight. Therefore, assuming without deciding it was an error to admit the evidence, the error was harmless.

b. The Social Media "Pictures"

Green argues that the circuit court erred in admitting "pictures" from "social media because they violated the best evidence rule." Specifically, he asserts the circuit court erred in admitting screenshots taken by Detective Phillips of posts on the "hatsgone_mad" Instagram account because "a screenshot is not sufficient."[15]

"[T]he best evidence rule requires that where the contents of a writing are desired to be proved, the [original] writing itself must be produced or its absence sufficiently accounted for before other evidence of its contents can be admitted." *Diaz v. Commonwealth*, 80 Va. App. 286, 310 (2024) (alterations in original) (quoting *Dalton v. Commonwealth*, 64 Va. App. 512, 522 (2015)). Documents that are considered "'duplicate originals'. . . are treated as 'originals' for purposes of the best evidence rule." *Id.* at 311 (quoting Kent Sinclair, *The Law of Evidence in Virginia* § 18-4[a], at 1267-68 (8th ed. 2018)). These documents are "'made at the same time,' 'by the same [mechanical] impression,' and each is an 'exact counterpart of the other.'" *Id.* (alteration in original) (quoting *Winston v. Commonwealth*, 16 Va. App. 901, 904 (1993)). "'[A]pplication of the best evidence rule is unnecessary' when the admitted evidence qualifies as an original." *Id.* (alteration in original) (quoting *Winston*, 16 Va. App. at 904).

---

[15] On appeal, Green also argues that the screenshots from social media lacked an adequate foundation and were not properly authenticated. However, "[n]o ruling of the [circuit] court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. The objection "must be both specific and timely—so that the trial judge would know the particular point being made in time to do something about it." *Hogle v. Commonwealth*, 75 Va. App. 743, 755 (2022) (quoting *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019)). "If a party fails to timely and specifically object, he waives his argument on appeal." *Id.* At trial, Green not only failed to object to the authentication or foundation of the screenshots at issue, he also clarified to the circuit court that his objection was to "best evidence" and that he had "no objection besides" the best evidence objection. Therefore, his argument is waived pursuant to Rule 5A:18. Although there are exceptions to Rule 5A:18, Green has not invoked them, and this Court will not do so sua sponte. *Spanos v. Taylor*, 76 Va. App. 810, 827-28 (2023).

Though on brief Green acknowledges this Court's opinion in *Diaz*, 80 Va. App. 286, and admits that it "states that screenshots are just as admissible as original Facebook posts because they are duplicate originals," he argues that the screenshots from social media posts are not sufficient to satisfy the best evidence rule.[16]  However, similarly to how a screenshot of a Facebook post is an exact counterpart of the post, so are screenshots of other social media platforms' posts.  Therefore, as this Court held in *Diaz*, screenshots of social media posts are duplicate originals that can satisfy the best evidence rule.  For that reason, the circuit court did not error in finding that the screenshots of the Instagram post did not violate the best evidence rule and in admitting the screenshots.

### c.  The Camera Footage Clips

Green also claims the circuit court erred in admitting clips of footage captured by motion-activated cameras affixed to homes that showed the shooting and individuals smacking prior to the shooting because the footage was not properly authenticated and was unfairly prejudicial.[17]  Specifically, he argues that "[t]he Commonwealth failed to authenticate the videos because it did not have a witness who worked for the [device's manufacturing] company and therefore could authenticate the videos."[18]

---

[16] Noteworthy, Green does not provide any argument on whether an Instagram post should be treated differently than a Facebook post.

[17] Green's assignment of error also states the Commonwealth did not lay a proper foundation and that the footage was irrelevant, but he failed to provide legal support or argument in relation to those assertions.  "Unsupported assertions of error do not merit appellate consideration." *Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017) (quoting *Jones v. Commonwealth*, 51 Va. App. 53, 56 (1992)).

[18] On appeal, Green specifically argues that an individual from the "Ring" company was necessary.  However, the record is not clear that all of the recording devices at issue were in fact Ring manufactured devices.

"Videotapes, like photographs, when properly authenticated, may be admitted under either of two theories: '(1) to illustrate the testimony of a witness, and (2) as "mute," "silent," or "dumb" independent photographic witnesses.'" *Brooks v. Commonwealth*, 15 Va. App. 407, 410 (1992) (quoting *Ferguson v. Commonwealth*, 212 Va. 745, 746, *cert. denied*, 409 U.S. 861 (1972)). Therefore, even at times where

> no human is capable of swearing that he personally perceived what a photograph [or videotape] purports to portray . . . there may nevertheless be good warrant for receiving [it] in evidence. Given an adequate foundation assuring the accuracy of the process producing it, the photograph [or videotape] should then be received as a so-called silent witness or as a witness which "speaks for itself."

*Id.* (alterations in original) (quoting *Ferguson*, 212 Va. at 746).

Contrary to Green's assertion, a representative from a device's manufacturer will not be necessary in every case in order for the device's footage to be admissible into evidence. A videotape is properly authenticated if accompanied "by evidence sufficient to support a finding that the thing in question is what its proponent claims." Va. R. Evid. 2:901. Here, the homeowners who installed and maintained the motion-activated devices testified to the source, production, and accuracy of the clips, including that: (1) they had installed or maintained the cameras on their homes; (2) what the process was for their cameras to record, the accuracy of the timestamps, and how they are notified when they start to record; (3) in their experience, the cameras recorded accurately (included in this testimony from three of the homeowners was that there were occasions when they had received a notification that the cameras were recording, they looked outside their homes and saw the same activity as what was being recorded); and (4) that the footage was not altered or able to be edited. One homeowner testified that he personally heard the gunshots at the time listed on the footage of the shooting outside his home. Accepting this testimony as true provided the circuit court with sufficient evidence to find that the footage

- 12 -

was what it was claimed to be: an accurate recording of the shooting and individuals smacking prior to the shooting.

Turning towards Green's argument that the clips were unfairly prejudicial, under Virginia Rule of Evidence 2:403(a)(i), relevant evidence may be excluded if "the probative value of the evidence is substantially outweighed by . . . the danger of unfair prejudice . . . ." "All evidence tending to prove guilt is prejudicial to an accused, but the mere fact that such evidence is powerful because it accurately depicts the gravity and atrociousness of the crime or the callous nature of the defendant does not thereby render it inadmissible." *Powell v. Commonwealth*, 267 Va. 107, 141 (2004). A circuit court must determine whether "the probative value of the evidence be substantially outweighed by the danger of unfair prejudice." *Lee v. Spoden*, 290 Va. 235, 252 (2015). To be considered "unfairly prejudicial," evidence must "inflame the passions of the trier of fact, or . . . invite decision based upon a factor unrelated to the elements of the claims and defenses in the pending case." *Id.* The responsibility for balancing the competing considerations of probative value and prejudice rests in the sound discretion of the circuit court. *See Kenner v. Commonwealth*, 299 Va. 414, 424 (2021).

Further, the general inadmissibility of prior bad acts evidence, as well as the numerous exceptions to that rule, are both well-established. "As a general rule, evidence of a defendant's prior bad acts or other crimes is inadmissible 'to prove the character trait of a person in order to show that the person acted in conformity therewith.'" *Osman v. Commonwealth*, 76 Va. App. 613, 640 (2023) (quoting Va. R. Evid. 2:404(b)). "However, such evidence may be admissible to prove motive[, opportunity, preparation, plan, knowledge, identity, absence of mistake or accident,] and intent[, or if they are a part of a common scheme or plan], but only if the circuit court determines that the 'legitimate probative value of such proof outweighs its incidental

- 13 -

prejudice.'" *See id.* (citing *Lambert v. Commonwealth*, 70 Va. App. 740 (2019)); *see also* Va. R. Evid. 2:404(b).

Here, one of the clips at issue depicted the shooting and the others depicted individuals smacking just prior to the shooting. While testimony showed that Green was driving a vehicle in some of the smacking clips and was captured in the shooting footage, he was not visible in the clips of the smacking. The evidence from the clips was probative in showing what took place during the shooting, who was present during the shooting, and in showing that Green and "all of the players" involved in the shooting were "in close proximity to the crime scene" right before the shooting. The clips corroborated Johnson's testimony that he, Green (driving the blue Honda depicted in several of the clips), and the other Spazz members were involved in the shooting and were smacking in the area close to the shooting just minutes before the shooting. Therefore, the clips were introduced for a permissible purpose, rather than for propensity. *See id.* While the shooting clip depicted the gravity and atrociousness of the incident and the smacking clips contained additional unlawful behavior, they did not "invite decision based upon a factor unrelated to the elements of the claims and defenses in the . . . case," or "suggest decision on an improper basis, . . . [such as] an emotional one." *Lee*, 290 Va. at 251-52. Thus, the circuit court did not abuse its discretion in admitting the camera footage clips.

CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment.

*Affirmed.*

Causey, J., dissenting.

The majority relies solely on the testimony of Taeshon Johnson that he and Spazz members had gone smacking "before" the day of the shooting to show that the Spazz gang had engaged in two predicate criminal acts—as required by statute to support a conviction of participation in a criminal street gang. However, Taeshon Johnson's testimony lacks the specificity needed to support a finding that the group had engaged in a predicate criminal act.

For one, appellant Green's act and the other two predicate acts must all be committed when the offender of each crime was actively a gang member. *Rushing v. Commonwealth*, 284 Va. 270, 277 (2012). Here, we do not know whether Taeshon and the other boys were gang members at the time—when he testified that they had gone smacking "before"—because we do not have a specific date of the offense. This Court has held that a conviction order without a date of the offense is not enough to establish a predicate act.[19] In *Phillips v. Commonwealth*, 56 Va. App. 526 (2010), an alleged gang member's conviction order "failed to establish that members of the Bloods had committed the predicate criminal acts" as the order did not include the dates of the offenses. *Id.* at 540. The *Phillips* court found that, without these dates, there was insufficient evidence to show that they occurred *prior* to the defendant's offense, a required element of the two or more predicate acts. *Id. See also Rushing*, 284 Va. at 277. Relying on

_____

[19] An overwhelming number of the precedent cases that found a predicate act under Code § 18.2-46.1 relied on conviction orders or witness testimony confirming a conviction occurred. *See, e.g.*, *Molina-Ramos v. Commonwealth*, No. 0046-23-1, slip op. at 6-7, 2024 Va. App. LEXIS 285, at *9-10 (May 21, 2024); *Hamilton v. Commonwealth*, 279 Va. 94, 109 (2010); *Rushing*, 284 Va. at 275-76; *Newton v. Commonwealth*, No. 0721-10-1, slip op. at 2-3, 2011 Va. App. LEXIS 212, at *3-4 (Jun. 28, 2011); *Corado v. Commonwealth*, 47 Va. App. 315, 332-33 (2005). In fact, *Phillips* is the only case to not rely on two convictions, and that was in part because the appellant himself confessed to being a gang member. 56 Va. App. at 541. The others rely only on *convictions* of identifiable gang members, not on gang-related crime *generally*. While none of the cases *mandate* a conviction to show proof of a predicate act, they certainly suggest a need for more than vague assertions of unadjudicated criminal conduct on an unknown date.

*Phillips*—as the majority itself does—Taeshon Johnson's offense cannot be a predicate criminal act enough to support Mr. Green's conviction because we do not know the specific date on or about which the offense occurred.

The Commonwealth had the burden of proving, *beyond a reasonable doubt*, that Spazz gang members had previously committed two or more "predicate criminal acts," on top of the crime that appellant Green committed, while acting as an active member of the gang. *Rushing*, 284 Va. at 277 (abrogated on other grounds by Code § 19.2-324.1); *Salcedo v. Commonwealth*, 58 Va. App. 525, 537 (2011). The Commonwealth failed to meet this heavy burden here. Though Taeshon Johnson testified that he and the same group went smacking "prior to" July 14, without a date of offense, we cannot say beyond a reasonable doubt that the smacking occurred *after* the boys joined the Spazz gang.

In its plain language analysis,[20] the majority has disregarded our mandate to read the statute as a whole. *See, e.g.*, *Chaffins v. Atl. Coast Pipeline, LLC*, 293 Va. 564, 571 n.1 (2017) (noting that appellate courts "do not read a word or phrase in isolation"). Even under a plain-language statutory analysis, to prove a predicate act, the Commonwealth must be held to a higher standard of proof than vague assertions of unadjudicated criminal conduct. The statutory definition implies a minimum need for two *specific* instances of criminal activity to be proven beyond a reasonable doubt.

For one, the General Assembly's use of numbers, singling out "two or more," necessitates the need for specific criminal actions from a specific date (or dates) to be proven. *See Rushing*, 284 Va. at 277. Taeshon Johnson spoke using the words "often" and "typical," which represent a general plurality, implying multiple different events. Linguistically, it is difficult to square the

---

[20] As referenced by the majority, the "language of [Code § 18.2-46.1] is free from ambiguity." *Phillips*, 56 Va. App. at 536.

statutory requirement of two violations of law with such vague witness testimony without siphoning to a specific instance occurring on or about a known date.

Second, the language used in the statute suggests that the predicate offense be chargeable or indictable.[21] Under Black's Law, a "criminal act" is defined as an "unlawful act that subjects the actor to *prosecution* under criminal law." *Criminal Act*, *Black's Law Dictionary* (12th ed. 2024) (emphasis added). And the definition for "predicate offense" is "an earlier offense that can be used to enhance a *sentence* levied for a later *conviction*." *Predicate Offense*, *Black's Law Dictionary*, *supra* (emphasis added). If a predicate criminal act subjects someone to prosecution or enhances a sentence, then it naturally follows that the Commonwealth must be able show a specific instance on or about a known date. For instance, a prosecutor can only indict someone when the indictment gives the accused "notice of the nature and character of the offense charged so he can make his defense." *Wilder v. Commonwealth*, 217 Va. 145, 147 (1976). The date and location of the offense is required to properly give such notice under Code § 19.2-220. *See, e.g.*, *Black v. Commonwealth*, 223 Va. 277, 279 (1982). While the indictment standard need not be

---

[21] In 2004, the General Assembly amended the statute to change "criminal activities" to "predicate criminal acts," closer mimicking the language from federal RICO cases. Va. Code Ann. § 18.2-46.1. *See also RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 329-30 (2016) ("The [RICO] statute defines 'racketeering activity' to encompass dozens of state and federal offenses, known in RICO parlance as predicates."). The federal standard requires, at minimum, an adjudicator—be it a prosecutor, grand jury, judge, or jury—to find that the elements of the predicate offense were met. *See RJR Nabisco, Inc.*, 579 U.S. at 330 ("These predicates include any act 'indictable' under specified federal statutes . . . as well as certain crimes 'chargeable' under state law."); *Ft. Wayne Books v. Indiana*, 489 U.S. 46, 61 (1989) ("As long as the standard of proof is the proper one with respect to all of the elements of the RICO allegation—including proof, beyond a reasonable doubt, of the requisite number of constitutionally prescribable predicate acts—all of the relevant constitutional requirements have been met."); *Walters v. McMahen*, 684 F.3d 435, 440-41 (4th Cir. 2012) (dismissing a case after the plaintiffs failed to plead the essential elements of the two predicate acts alleged); *United States v. Levasseur*, 846 F.2d 786, 801 (1st Cir. 1988) ("[T]he jury must be satisfied that each such essential element has been proved beyond a reasonable doubt before it may consider whether such a predicate act constitutes part of a pattern of racketeering."); *United States v. Carrillo*, 229 F.3d 177, 183 (2d Cir. 2000) (noting the RICO statutes "require of a predicate act based on state law that the act include the essential elements of the state crime").

the standard here, coupled with *Phillips*, *Wilder* and *Black* highlight how a general admission of crime is not enough to establish a predicate criminal act without a date of offense. *See also Phillips*, 56 Va. App. at 539-41 (refusing to accept a predicate criminal act where the date of offense was unknown).

Setting the appellant aside, as a general rule, by turning away from the evidentiary need to prove an indictable or chargeable predicate act, the majority sets a dangerous precedent for young men and women who find themselves mixed up in unexpected situations, without knowledge of what their friends or community members may have done in the past. With concern for them in mind, I respectfully dissent.